Filed 11/13/15  In re K. M. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.M. et al., Persons Coming Under the Juvenile Court Law. | B261011 (Los Angeles County Super. Ct. No. CK95357) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.V., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Mother A.V. appeals the juvenile court's visitation order after the court established a legal guardianship and terminated dependency jurisdiction over the children, K.M. and G.M. The order requires that mother's visitation be monitored by a therapist or professional monitor at mother's expense. We affirm.

## FACTS AND PROCEDURE

K.M. and G.M. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in August 2012 when they were 14 years old and nine years old, respectively. K.M. and mother were arguing and K.M. said he wanted to kill himself. G.M. called mother a "bitch" and mother slapped her. Mother also kicked G.M. when they were walking to the bank after the argument. G.M. jumped on the balcony of the family's apartment afterward and sat on the roof until mother calmed down.

Officers arrived at the scene. Mother told one of the officers she did not "want to live anymore." A few days prior to this argument with the children, mother told them, "I want to die sometimes but I'm afraid to." The children were concerned mother would harm herself. Mother had been referred to therapy but was not following through with it. She felt her neighbors at the apartment complex did not like her, and they often taunted her, laughed at her, chased her, and called her names. Mother appeared nervous and did not recall doing some of the things G.M. reported. The officers took mother to the hospital for a "5150 [e]valuation."[1]

Maternal grandmother expressed concerns about mother's mental health for the last two years. She felt mother had become "paranoid" and isolated herself from the family after she ended a relationship with a boyfriend. Maternal grandmother reported

---

[1]    Pursuant to Welfare and Institutions Code section 5150, subdivision (a), "[p]eace officers, among others, have been entrusted with the duty, on probable cause, to take into custody any person who, 'as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled,' and to place such a person in a county-designated facility for the initial 72-hour treatment and evaluation." (*People v. Triplett* (1983) 144 Cal.App.3d 283, 286-287.)

2

that mother would often keep the children home from school because she was concerned they were being mistreated there. She would also go to their school to check on them because she believed they were being mistreated. Maternal grandmother was further concerned by behavior she perceived as inappropriate based on the children's age. For instance, maternal grandmother had to stop mother from bathing K.M. herself even though K.M. was 14 years old. Mother also held nine-year-old G.M. like a baby in public on numerous occasions. The family had been discussing plans to intervene and remove the children from mother's care because they believed her behavior was becoming unsafe.

DCFS filed a petition under Welfare and Institutions Code section 300, subdivision (b),[2] alleging mother suffered from mental and emotional problems that rendered her incapable of providing regular care and supervision for the children. The court detained the children with maternal grandmother and ordered weekly monitored visits for mother. After the detention, DCFS filed an amended petition adding an allegation that father Francisco M.[3] had failed to provide the children with the necessities of life.

The children disclosed other details relating to mother's mental health in DCFS's jurisdiction/disposition report. For approximately two years, mother was "always" sad, cried often, and had frequent migraines. She took medication that "would make her go to sleep." She would have panic attacks and call for an ambulance. She had been unemployed for one and a half years. She went to school but quit after three months. She told the children she was too stressed to find a job. The family would receive $400 a month in food stamps, but they would run out of food stamps half way through the month. They had gone to shelters six times. Maternal grandmother would give mother

---

**2** Further undesignated statutory references are to the Welfare and Institutions Code.

**3** Father, who apparently resides in Rosarito, Mexico, never responded to the social worker's and his attorney's attempts to contact him. He is not a party to this appeal.

money. The children felt mother was overprotective. She kept the children out of school for approximately a year because they "needed to get a physical exam," according to her. Anytime someone talked to the children, mother wanted to know what was said. She suspected a neighbor was following them one time when the neighbor happened to leave the apartment building at the same time they left. Mother "was like that with everybody. She always thought people wanted to do something bad to" the children. G.M. felt sad and scared when mother told them she wanted to die. G.M. said things like this too, but she "only mean[t] it a little bit."

Mother disclosed to the social worker that her diagnosis was major depression with psychotic features. She was taking Xanax for anxiety and acetaminophen for migraines. She was taking Abilify, an antipsychotic, but she stopped because she felt it was making her anxious and nervous.

Maternal grandmother reported that mother was anxious and calling several times a day to speak to the children. She also came to maternal grandmother's house daily to bring them food. She had recently become very upset and fought with K.M. during one of these trips because the children said they wanted to live with their uncle. Maternal grandmother had to stop mother from hitting K.M. Mother threatened to take the children from maternal grandmother.

Maternal aunt and uncle (mother's brother and his wife) expressed concern over mother's depression and behavior since she had broken up with her boyfriend. They felt she was paranoid and had isolated herself and the children. She would talk about a government conspiracy against her. She once thought their whole street was under quarantine and said they could not leave their home. Maternal grandmother and the children had moved into maternal aunt and uncle's home to escape mother's constant calls and visits.

G.M.'s therapist had been seeing G.M. for three months. Mother initially brought her to get treatment. They were working on G.M.'s anxiety. G.M. reported that mother hit her in the mouth and on the head. She would also wake up G.M. in the middle of the night to ask whether G.M. was okay, which scared G.M. She told G.M. not to attend

4

school because it was too stressful. The therapist confirmed that mother isolated the children from family and did not send them to school. Mother wanted to be present for all of G.M.'s sessions and seemed to be coaching her on what to say. The therapist opined that mother was hypervigilant and was relying on G.M. for emotional support. The therapist also assigned mother a case manager and was trying to link her with mental health services, but mother refused them. G.M. was continuing with therapy, and DCFS referred K.M. for therapy also.

The children had been having weekly four-hour visits with mother since their detention. K.M. wanted to stop visiting with mother because he was upset at how she "interrogate[d]" the children on their daily activities. When K.M. did not appear for a visit at mother's home that maternal grandmother was monitoring, mother became angry and yelled at maternal grandmother, demanding that she arrange for K.M. to appear and accusing her of "poisoning" K.M. against mother. Maternal grandmother explained that K.M. refused to come and she could not force him. Mother asserted that she was leaving with G.M. and taking her to a movie. Maternal grandmother would not allow this, and mother then locked herself and G.M. in a room and refused to release G.M. Police officers had to convince mother to open the locked door. DCFS notified the parties that subsequent visits would take place at the DCFS office.

In October 2012, mother pleaded no contest and submitted a waiver of rights form. The court sustained the amended petition alleging that she suffered from untreated emotional problems that rendered her incapable of providing regular care and supervision. The court declared the children dependents of the court under section 300, subdivision (b) and ordered them removed from mother's custody. It ordered reunification services for mother and weekly visitation at the DCFS office, which maternal grandmother could not monitor. Mother's case plan consisted of parenting classes, mental health counseling, and psychiatric treatment. DCFS approved maternal aunt and uncle's home for placement.

During the six-month review period, K.M. reported that mother made him "feel bad" and accused him of not loving her because he chose not to visit with her. G.M. had

been displaying signs of anxiety. Mother told the children that maternal aunt and uncle wanted to take them from mother so that they could get government funds for the children. In actuality, maternal aunt and uncle had signed a statement saying they were willing to provide a home for the children without payment. Mother also told the children to tell the social worker that they wanted to have unmonitored and extended visits with mother or live with mother. When maternal uncle, who monitored visits, tried to redirect mother from this type of conversation, mother would become verbally aggressive and accuse him of "stealing her children." She repeatedly engineered ways to be alone with G.M. during visits, such as taking her into the women's restroom at the DCFS office. Both children said mother made them feel anxious, and they were afraid of how she would react if they told her they did not want to live with her. The children and their therapist reported that maternal aunt and uncle treated them well, they felt safe and protected there, and they were happy to be living there. Neither child wanted to return to mother's custody because they did not feel she was getting "better."

Mother had attended parenting classes and 10 therapy sessions, had been taking her medication, and had been evaluated by a psychiatrist. But she continued to display symptoms of nervousness and "problems in perceiving and interpreting other people and events." She repeatedly insisted to the social worker that maternal aunt and uncle were mistreating and abusing the children, even though all reports from the children and their therapist were to the contrary. Mother contacted the police and demanded that they arrest maternal uncle. She also contacted maternal aunt's mother by phone and threatened to have maternal aunt arrested for "child stealing." Mother visited the children's school repeatedly in an attempt to have unmonitored contact with the children.

At the contested six-month review hearing in May 2013, the court continued mother's reunification services for another six months. It also entered a permanent restraining order prohibiting mother from coming near the children's home and school or contacting the children, except during monitored visits at the DCFS office.

During the 12-month review period, mother continued to be hypervigilant during phone calls and visits with the children. Both were healthy and showed no signs of

illness during the period. Still, mother routinely asked them a series of scripted questions about their eating and sleeping habits and signs of illness. She encouraged them to seek immediate medical attention for even minor aches and pains and demanded that maternal aunt and uncle provide such attention. She also discouraged them from engaging in extracurricular activities or performing well in school if it caused them stress or tiredness. She opposed summer school and after-school tutoring. Maternal aunt and uncle reported that G.M. became extremely fearful if she suspected she had a physical ailment to the point that G.M. feared she would die.

At the 12-month review hearing in November 2013, the court ordered reunification services to continue and gave DCFS discretion to walk the matter on calendar to modify the restraining order to liberalize visits. It also ordered DCFS to arrange for a psychological evaluation of mother. The court set the matter for a permanency planning hearing.

During the last review period, mother was visiting the children inconsistently and missing therapy appointments. Mother said this was because she did not have transportation money, but DCFS was giving mother transportation funds of $85 per month, which DCFS had also recently increased by $40 per month. Mother said she needed more money. She refused to have the psychological evaluation the court ordered and insisted that "DCFS caused her problems by taking her children for no reason." She blamed DCFS for causing her stress and depression. Both children expressed concern that mother's state had not improved and they did not think she could care for them. They were worried the court would return them to mother's custody, and they wanted to stay with maternal aunt and uncle.

After mother missed a visit, she appeared that night at maternal aunt and uncle's home and asked to see the children. Maternal uncle did not allow her to see them because such a visit would have violated the restraining order. Afterwards, mother stood outside the house for approximately 30 minutes. Mother visited a hospital, saying she had a headache and claiming she and the children were victims of a crime committed by maternal aunt and uncle.

In May 2014, the court terminated reunification services and found that returning the children to mother's physical custody would create a substantial risk of detriment to their physical or emotional well being. It set the matter for a selection and implementation hearing.

Before that hearing, the children's counsel and DCFS filed petitions under section 388 to modify the visitation order.[4] They wanted visits to be monitored in a therapeutic setting per the recommendation of the children's therapist. According to the therapist, mother's erratic behavior and interactions with the children during visits were impacting them negatively. During one recent visit at the DCFS office, G.M. witnessed an altercation between mother and maternal uncle when mother became angry because he would not deliver food to the children that mother had brought. G.M. saw mother hit and yell at maternal uncle. She cried throughout the car ride home from the visit and told her therapist and maternal aunt and uncle that she no longer wanted to visit with mother. K.M. was also refusing to visit with mother. He was not present for the altercation between mother and maternal uncle, but he became upset when he learned about it. Mother was also sharing information about her mental and physical health and living situation that the therapist felt was causing the children additional anxiety. Mother discussed her depressive symptoms, repeated visits to the hospital, and her unstable living situation with the children. She told K.M. about conflicts she was having with paternal grandmother, with whom mother lived, and having to sleep at the park because of these conflicts. K.M. also reported that mother was discouraging him from doing well in school. He said that he saw no point in doing well at school if mother did not care.

Further, mother had been arriving at the children's home unannounced and demanding to see the children. G.M.'s anxious symptoms and behaviors had increased

---

**4** Section 388 permits a party to petition the juvenile court "to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court" when a "change of circumstance or new evidence" justifies the modification. (§ 388, subd. (a)(1).)

recently, including loss of sleep, loss of appetite, negative intrusive thoughts, difficulty focusing and concentrating, nightmares, and not following directions. K.M.'s behaviors and feelings included an increase in sadness and disappointment, suicidal ideation, hopelessness about the future, feelings of isolation, refusal to follow rules at home, low motivation for family social outings, low motivation at school, and negative intrusive thoughts after visits with mother. The therapist thought K.M. in particular was exhibiting symptoms of posttraumatic stress disorder as a result of his relationship and contact with mother.

The court granted the petitions of DCFS and the children's counsel and ordered that mother's monitored visits take place in a therapeutic setting with a neutral therapist.

By the time DCFS prepared its report for the selection and implementation hearing, the children had resided with maternal aunt and uncle for over two years. They had not visited with mother in over three months. The children wanted to remain as placed. They and their caretakers had formed a tightly knit and loving bond. Maternal aunt and uncle wanted a legal guardianship established rather than an adoption.

At the selection and implementation hearing in November 2014, the court found return to mother would be detrimental to the children's physical or emotional well being, the children were not adoptable, and a guardianship promoted their best interests. The court appointed maternal aunt and uncle legal guardians of the children. The court also modified the restraining order to permit mother weekly visits with the children monitored by a therapist or professional monitor at mother's expense. After establishing the guardianship, the court terminated dependency jurisdiction. Mother filed a timely notice of appeal.

## DISCUSSION

When the court orders a permanent plan of legal guardianship for a dependent child, section 366.26, subdivision (c)(4)(C) governs parent-child visitation. (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1558.) Specifically, it states: "The court shall also make an order for visitation with the parents or guardians unless the court finds by a preponderance of the evidence that the visitation would be detrimental to the physical or

9

emotional well-being of the child." (§ 366.26, subd. (c)(4)(C).) "'[T]he power to regulate visitation between minors determined to be dependent children [citation] and their parents rests in the judiciary.' [Citation.] As such, dependency law affords the juvenile court great discretion in deciding issues relating to parent-child visitation, which discretion we will not disturb on appeal unless the juvenile court has exceeded the bounds of reason." (*In re S.H., supra*, at pp. 1557-1558.)

Mother contends the court abused its discretion when it ordered that she pay for professional monitoring of visits because she was indigent and the order effectively denied her visits without the requisite finding of detriment. We disagree and find no abuse of discretion.

The statute required the court to "make an order for visitation" *or* find that visitation would be detrimental to the children. (§ 366.26, subd. (c)(4)(C).) The court did the former, dictating how often visits could occur and the conditions under which they could occur. The court's order complied with the statute. The single case on which mother relies, *In re M.R.* (2005) 132 Cal.App.4th 269, is inapposite. *In re M.R.* held that delegating authority to the children's legal guardians to arrange visitation "'at their discretion'" constituted an improper delegation of the judicial function and an abuse of discretion. (*Id.* at pp. 272, 274.) The court could delegate discretion on the time, place, and manner in which visitation would occur, but could not delegate its discretion to determine whether any visitation at all would occur. (*Id*. at p. 274.) Here, the court did not delegate any decisions and instead expressly set forth the frequency and other terms of visitation. *In re M.R.* was concerned with the court's abdication of its role. The court in this case assumed its proper role when it dictated the conditions of visitation.

Mother argues that the court's order "in essence delegate[ed] whether the visits will occur to mother's financial circumstances." This attempt to cast the challenge as a "delegation" issue fails to persuade us. The conditions of visitation are the issue. A court has considerable discretion to impose conditions or "further define the right to visitation in light of the particular circumstances of the case before it." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) Moreover, when, as here, the court terminates reunification

10

services and moves forward with a permanent plan, "the parents' interest in the care, custody and companionship of the child[ren] are no longer paramount." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The focus then shifts to the children's need for permanence and stability. (*In re S.H., supra*, 197 Cal.App.4th at p. 1559.) "Accordingly, the court must turn its focus to the child's best interests, rather than the parent's, in deciding issues that may arise." (*Ibid.*)

Given these objectives, the court's order for visitation monitored by a professional monitor at mother's expense was within the bounds of reason and adequately supported by the record. Mother's erratic and harmful conduct supported the court's order for monitoring by a therapist or professional. She demonstrated that a nonprofessional monitor was not going to be equal to the task. With maternal grandmother or maternal uncle acting as monitors, she acted inappropriately in a number of ways. She coached the children on what to say to the social worker, engineered ways to get G.M. alone (going so far as to lock the two of them in a room), became verbally aggressive with the relative monitors, voiced accusations of "child stealing," discouraged the children from doing well in school, burdened the children with details of her mental health and precarious living situation, and even hit maternal uncle. Her behavior was negatively impacting the children's mental and emotional health, according to their therapist. The order requiring a professional monitor after termination of jurisdiction reflects a reasonable concern that mother continued to pose a threat to the children's well being. Thus, the court was properly focused on the children's best interests, which was the paramount concern at that point, not mother's interest in the companionship of her children.

Mother does not appear to dispute that a professional monitor was appropriate. She suggests only that she should not bear the cost of the monitor because she was indigent, and the court could not impose such a condition without making a detriment finding. We cannot think that mother wants us to reverse and remand for the court to make a detriment finding. The record contains ample evidence to support a conclusion that "visitation would be detrimental to the physical or emotional well-being of the child[ren]" (§ 366.26, subd. (c)(4)(C)) if the court was so inclined to find this, especially

11

in light of the statements from the children's therapist in connection with the section 388 petition filed just before the court established the guardianship. And if the court made this finding, mother would be entitled to no visitation at all.

*In re Chantal S.* (1996) 13 Cal.4th 196 (*Chantal S.*) is instructive. In *Chantal S.*, the court took jurisdiction based on findings that Chantal's father was violent and her mother had failed to protect Chantal. (*Id.* at p. 201.) The court terminated dependency jurisdiction after Chantal's mother complied with her service plan and entered an exit order giving mother custody of Chantal and giving father visitation rights under certain conditions. (*Id.* at p. 202.) Chantal's father was serving a three-year prison sentence at the time. (*Id.* at p. 201.) The conditions of visitation included that father had to attend psychotherapy regularly and make satisfactory progress before visits could occur, visits had to be monitored by Chantal's therapist at father's expense, and father had to permit Chantal's therapist to communicate with his therapist about his progress in therapy and any issues Chantal's therapist saw during visitation. (*Id*. at p. 202.) Chantal's father asserted an argument similar to what mother asserts here—that the court delegated too much discretion to the therapists to determine whether visits could occur. (*Id.* at p. 213.) The court held that even assuming arguendo the visitation order delegated too much judicial discretion to the therapists, Chantal's father was not prejudiced: "[F]ather does not contest the position that on this record the juvenile court would have been within its discretion if it simply denied him any visitation. The fact that the juvenile court rejected that course, and instead issued the restrictive order challenged now, amounts to a windfall to father, not a violation of his rights." (*Id.* at p. 214.)

The same reasoning applies here. Mother has not shown prejudice. Assuming mother's delegation challenge made sense, mother does not contest that the court could have made an amply supported detriment finding on this record. Thus, the fact that the court rejected this course and gave mother an opportunity for visitation amounts to a windfall for her, not a prejudicial error requiring reversal.

On a final note, mother's contention raises the question of who should bear the expense of a professional monitor if she does not. Mother does not provide an answer.

The court has terminated dependency jurisdiction and DCFS will no longer be involved in the case.  As between the children's legal guardians and mother, we cannot say the court acted unreasonably by requiring mother to bear the expense.  It was mother's conduct that necessitated professional monitoring.  Moreover, although the record contains indications of her indigence—her lack of employment and a permanent home, for instance—it would be pure speculation for us to assume that she will never have funds for a professional monitor.  In any event, it is not mother's right to visitation but the children's best interests that are paramount now, and mother has not shown the court's visitation order abused its discretion.

## DISPOSITION

The order is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.

13